```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DUMKA VIATOR,

                            Plaintiff,          02-CV-6453

            v.
                                                DECISION & ORDER
CITY OF ROCHESTER, ROCHESTER
POLICE DEPARTMENT, POLICE OFFICER
MITCHELL (True First Name Unknown),
Individually and in his Official
Capacity, STATE OF NEW YORK,
NEW YORK STATE POLICE, COUNTY
OF MONROE, MONROE COUNTY
SHERIFF'S OFFICE, POLICE OFFICERS
"JOHN DOE 1-10", (Last Ten Names
Being Fictitious, True Names
Unknown, Said Persons Being Police
Officers, Employees and/or Agents
of Defendants, Who Stopped,
Detained, Questioned and Searched
Plaintiff's Person and Vehicle),

                            Defendants.
_____
```

## INTRODUCTION

Plaintiff Dumka Viator ("plaintiff") brings this action against the City of Rochester (the "City") and Rochester Police Officer John Mitchell ("Officer Mitchell") pursuant to 42 U.S.C. § 1983, alleging that he was racially profiled and that his constitutional rights were violated when Officer Mitchell and other officers from the Rochester Police Department detained him, interrogated him and searched his automobile during the course of

a traffic stop.[1]  The City contends that the police officers were members of an interdiction team dedicated to stopping the flow of illegal narcotics into Monroe County, and that they had probable cause to stop and search plaintiff's automobile.  Officer Mitchell also claims that he is entitled to qualified immunity under 42 U.S.C. § 1983, since the alleged violation occurred in the course of his official duties.

A bench trial was held before the Court on August 2 and 3, 2005.  Five witnesses testified at trial, including: plaintiff Dumka Viator; Rochester Police Officer John Mitchell: plaintiff's wife Sharon Viator; Rochester Police Officer Eden Torres; and Rochester Police canine Officer Tim Waterman.  The following constitutes my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## **FINDINGS OF FACT**

Plaintiff was born in Nigeria and immigrated to the United States approximately seventeen years ago.  For at least the last four years, he has resided in the town of Irondequoit, a suburb of Rochester, New York, with his wife and five children.  He

---

[1] By Decision and Order dated December 17, 2002, plaintiff's claims against New York State and the New York State Police Department were dismissed with prejudice. (Doc. No. 13). By Stipulation and Order filed November 8, 2004, plaintiff's claims against defendants Monroe County and Monroe County Sheriff's Office were dismissed with prejudice. (Doc. No 31).  By Order filed July 14, 2005, plaintiff's claims against the remaining State defendants were dismissed with prejudice.  (Doc. No. 36).

is presently employed as a senior sales representative and finance advisor at Webster Chrysler Jeep, but previously was employed as an automobile salesman at Irondequoit Dodge when the events that gave rise to this controversy occurred. One of the perks of his employment at Irondequoit Dodge was that he was able to select any of the demo vehicles at the dealership for his personal use.

Plaintiff testified that on Wednesday August 29, 2001, he drove from Rochester to New York City in a gold-colored 2001 Jeep Grand Cherokee which was registered to the dealership. His father had recently passed away and he needed to renew his passport at the Nigerian embassy so that he could attend his father's burial in Nigeria. While in New York City, he also planned to watch a tennis match at the U.S. Open. He accomplished both goals and drove back to Rochester the following day, August 30, 2001. He traveled the New York State Thruway directly from New York City, and stopped only to refill his gas tank and purchase coffee. At approximately 6:00 p.m., he exited the Thruway at Exit 45, where he stopped to pay a toll of $9.95 and continued westbound on Route 490 West towards Rochester.

At that time, Rochester Police Officer Christopher Tuttle was positioned near the Exit 45 toll booths as a member of a drug interdiction detail comprised of New York State Troopers, Monroe County Sheriff's deputies, and Rochester Police Department officers named the "Metro Rochester Narcotics Unit" ("MRNU"). MRNU's

mission was to interdict and prevent the flow of illegal narcotics into Monroe County. Knowing that much of Rochester's illicit drug supply comes from New York City, Officer Tuttle's role was to observe any vehicles that paid a $9.95 toll, which is the toll for a vehicle making a direct trip from New York City. He would then inform plainclothes officers who were stationed nearby of the make, model and license plate of such a vehicle, who in turn would conduct a moving surveillance of that vehicle. The plainclothes officers, who were driving unmarked cars would coordinate their surveillance with uniformed officers driving marked cars and follow the "vehicle of interest." If the driver committed a traffic violation, it would then be stopped and issued a ticket. Such a stop would give the uniformed officer the opportunity to question the driver and determine whether there existed probable cause to search the vehicle for illicit narcotics. If the driver of a vehicle of interest did not commit a traffic violation, he would not be stopped.

On August 30, 2001, Officer Tuttle observed that plaintiff paid a $9.95 toll, and radioed Officer Torres and a Monroe County Sheriff's Deputy that a gold-colored Jeep Grand Cherokee had just returned from New York City exiting from Interstate Route 90 at Exit 45. The officers then followed plaintiff as he continued on Route 490 West for approximately six miles before they radioed to Officer Mitchell, who was positioned nearby and directed that he

should take over monitoring the vehicle. Officer Mitchell, in his marked police car, entered Route 490 West at the Penfield Road exit and followed plaintiff for approximately one to two miles before he directed him to pull over for failing to signal when making a lane change.

### A. The Traffic Stop

Plaintiff testified that once through the toll booth, he traveled in the far right lane of Route 490 West until he reached the Penfield Road exit. He then moved into the far left lane, or the "fast lane," to allow cars to merge onto Route 490 West from the right. He first noticed a Rochester Police vehicle when he was passing the location where Route 590 North merged into Route 490 West. According to plaintiff, the officer pulled into the fast lane just behind him and almost immediately activated the vehicle's emergency lights, signaling that plaintiff should pull over to the side of the road. Plaintiff decelerated and used his turn signal to indicate that he was changing lanes, and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit. He alleges that he never changed lanes without first signaling.

Officer Mitchell testified that he was assisting MRNU on the night of August 30, 2001, when he received a radio call from Officer Torres alerting him to an approaching vehicle of interest. According to Officer Mitchell, he entered Route 490 at the Penfield Road exit - several miles before the Route 590 off ramp. He

noticed plaintiff in the fast (far left) lane, and followed him for several miles before he observed plaintiff moving from the fast lane to the middle lane without signaling the lane change. Officer Mitchell, realizing that a failure to signal a lane change is a violation of the New York State Vehicle and Traffic Law, then turned on his emergency lights to signal plaintiff to pull over. Plaintiff complied and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit.

Officer Torres also testified that he initiated the moving surveillance of plaintiff's automobile once plaintiff paid the $9.95 toll at Exit 45 of the New York State Thruway. He then followed plaintiff in his unmarked car along Route 490 West and advised Officer Mitchell to take over the surveillance near Penfield Road. He observed Officer Mitchell enter Route 490 at the Penfield Road Exit and follow plaintiff. Officer Torres then dropped back and did not see the illegal lane change because vehicles ahead of him were in his line of sight.

Based on these facts adduced at trial, I find that Officer Mitchell observed plaintiff changing lanes without signaling. Both Officer Mitchell and Officer Torres testified that Officer Mitchell was positioned on Linden Avenue when he received the call to follow plaintiff's vehicle and entered Route 490 West from the Penfield Road entrance. I find the officers' versions of events to be more credible than plaintiff's. Moreover, I find that plaintiff's

credibility is compromised since he admitted on re-direct examination that he had lied while under oath on at least three prior occasions concerning the identity of his female passenger on August 30, 2001. Accordingly, I find that the evidence clearly establishes that plaintiff changed lanes without signaling.

    B.   The Search of Plaintiff's Vehicle

        1.   Plaintiff Consented to the Search of His Vehicle

Once plaintiff stopped his automobile on the right shoulder of Route 490 West near the Winton Road exit, Officer Mitchell parked his patrol car a short distance behind him. Officer Mitchell then approached the car and spoke with plaintiff.

Plaintiff testified that Officer Mitchell first informed him that he was being stopped for speeding. Plaintiff replied that he had his cruise control set within the legal speed limit. Officer Mitchell then asked where plaintiff was coming from, to which plaintiff responded "New York City." According to plaintiff, Officer Mitchell then returned to his patrol car. Approximately five minutes later Officer Mitchell returned to plaintiff's vehicle and again asked where he was coming from. Plaintiff asked if there was a problem and Officer Mitchell informed him that he had been stopped for changing lanes without signaling. Plaintiff then inquired of Officer Mitchell about the discrepancies in the reasons offered to him for stopping his vehicle. Officer Mitchell replied by engaging in a line of questioning (to which plaintiff took

offense), including whether plaintiff knew anything about narcotics and why he was driving a car that was not registered to him. Officer Mitchell then asked plaintiff for consent to search his vehicle. Plaintiff asked if he needed a warrant first, to which Officer Mitchell replied that a police dog would not need a warrant. At that point, plaintiff alleges that Officer Mitchell lunged toward the driver's door, grabbed the handle, and "yanked" it open. Plaintiff testified that Officer Mitchell's aggressive actions frightened him and he exited the vehicle. He then consented to Officer Mitchell's request to search his vehicle on the condition that he could watch, "to make sure that [they] didn't put anything in my car." He further testified that Officer Mitchell never asked him for his driver's license or vehicle registration card, and that he did not receive a traffic ticket until he later prompted Officer Mitchell for some documentation of the stop. He admitted that he did not try to stop the search at any point, and that he was never handcuffed, personally searched, or placed in police custody.

Officer Mitchell testified that upon approaching plaintiff's vehicle on August 30, 2001, he tried to engage plaintiff in small talk to put him more at ease and immediately asked for plaintiff's driver's license and vehicle registration card. He also testified that as he approached plaintiff's vehicle he noticed in plain view that plaintiff had only a gym bag and lap top computer in the rear

of the vehicle, which he thought suspicious since plaintiff had informed him that he and his passenger had been in New York City for "several days." He returned to his patrol car where he ran plaintiff's license plate and learned that the car was not registered in plaintiff's name, but in the name of an automobile dealership. While in his patrol car, he also radioed Officer Torres, who was nearby, and informed him of his suspicions and that he planned to ask for consent to search the vehicle. Officer Mitchell also contacted Officer Waterman to request that he travel to the scene with police dog "Griz" to conduct an exterior search of plaintiff's vehicle.

Officer Mitchell testified that when he returned to plaintiff's vehicle he asked for plaintiff's consent to search the vehicle. According to Officer Mitchell, plaintiff acquiesced on the condition that he could watch the search. He did not recall plaintiff inquiring about a search warrant, nor did he observe another officer nearby when plaintiff gave consent to search.

Officer Torres arrived on the scene just after Officer Mitchell returned to plaintiff's vehicle. He parked behind Officer's Mitchell's patrol car and walked toward plaintiff's vehicle. He testified that although he did not hear Officer Mitchell ask plaintiff's consent to search the vehicle he did hear plaintiff agree to the search provided he could watch.

Based on these facts, I find that plaintiff gave Officer Mitchell his consent to search his vehicle. Both Officer Mitchell and Officer Torres testified that plaintiff agreed to the search on the condition that he could watch. In addition, I find inconsistencies in plaintiff's version of events that lead me to doubt his credibility. For instance, had Officer Mitchell never asked for plaintiff's driver's license, as plaintiff testified, he could not have issued the traffic ticket because information from the driver's license was needed to complete the traffic summons. Moreover, plaintiff gave three different versions of the identity of his female passenger, but explained that he did so to protect his "family interests." Accordingly, I find that the evidence clearly establishes that plaintiff consented to the search of his vehicle on the condition that he could observe the search.

### 2. The Canine Searches

Plaintiff testified that before the manual search of his vehicle began, a canine search was conducted. He claimed that the police dog, a large German Shepard, was removed from the rear seat of a patrol car and led directly to the driver's seat of his vehicle. Plaintiff recalled that the police dog had sniffed everything in the car, including the inside of his tennis and laptop bags. He further testified that after the search of the interior of his vehicle, the canine was led directly back to the patrol car. Plaintiff did not see the police dog search the

perimeter of the exterior of the vehicle, nor did he see the dog "alert" or "hit" during the search.

According to Officer Mitchell's testimony, the police dog arrived just after plaintiff consented to the search of his vehicle. Upon arriving at the scene, Officer Waterman leashed Griz before removing him from the patrol car and led the dog to plaintiff's vehicle. Griz first circled the perimeter of the vehicle to search the exterior. At the vehicle's driver's side rear bumper, Griz started to bark, scratch and swat, indicating that he had detected the scent of narcotics. After completing the exterior search, Officer Waterman placed Griz in plaintiff's car where he conducted an interior search, and again indicated that he found the scent of narcotics in the back of the vehicle. Officer Waterman then returned Griz to his patrol car and left the scene.

Plaintiff's attorney called Officer Waterman, the canine handler, to testify at trial but did not address whether he conducted a search of the exterior of the vehicle with Griz or whether Griz indicated that he had detected the scent of narcotics. Instead, his inquiry of Officer Waterman was limited to the nature of the charge and content of the traffic summons issued to the plaintiff by Officer Mitchell.

I find that the evidence established at trial clearly demonstrates that a canine search of the exterior of plaintiff's vehicle was conducted, and that the police dog indicated that he detected the scent of an illicit substance.

### 3. The Manual Search

Plaintiff, Officer Mitchell and Officer Torres each testified that the manual search conducted subsequent to the canine searches revealed no illicit substances.

## CONCLUSIONS OF LAW

Plaintiff alleges that he was discriminated against on the basis of his race in violation of 42 U.S.C. § 1983. Section 1983 allows an individual to sue for deprivation of any federally protected right by a person acting "under the color of any statute, ordinance, regulation, custom or usage of any State or Territory of the District of Columbia. . . ." 42 U.S.C. § 1983. Specifically, plaintiff claims that on August 30, 2001, he was the subject of racial profiling and the unreasonable stop and search of his vehicle by Officer Mitchell and other officers from the Rochester Police Department in violation of his constitutionally protected right to be free from an unreasonable search under the Fourth Amendment.

Plaintiff bears the burden of proving by a preponderance of the evidence that he was deprived of a right secured by the Constitution or by the laws of the United States and that the person or persons depriving the party of the right acted under color of state law. Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2d Cir.1991).

For the reasons set forth below, I find that plaintiff has failed to establish by a preponderance of the evidence that any of

his constitutionally protected rights were violated as alleged under 42 U.S.C. § 1983, and his complaint, therefore, is dismissed.

### A.   Officer Mitchell Had Probable Cause to Stop Plaintiff

Plaintiff first argues that Officer Mitchell did not have probable cause to stop his vehicle on the evening of August 30, 2001, that he was stopped principally because he is black, and that the traffic violation was a pretext to investigate possible drug trafficking.

It is well-established that an automobile stop is reasonable under the Fourth Amendment if an officer has probable cause to believe that a traffic violation has occurred, even if the traffic violation is only a pretextual reason for the stop. Whren v. United States, 517 U.S. 806, 810 (1996). "[A]n observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." United States v. Dhinsa, 171 F.3d 721, 725 (2d Cir.2001).

As explained above, Officer Mitchell witnessed plaintiff move from the fast lane to the middle lane without signaling the change, and cited plaintiff with a violation of New York State Vehicle and Traffic Law § 1163(a), which provides that "[n]o person shall . . . move right or left on a roadway unless such movement can be made with reasonable safety."  N.Y. VEHICLE AND TRAFFIC LAW § 1163(a) (McKinney's 1959).

Plaintiff argues that § 1163(a) requires a motorist only to make a safe lane change, and that since plaintiff made a safe lane

change there was no traffic violation.  However, this argument ignores an entire sentence of § 1163(a) which provides that "[n]o person shall so turn in any vehicle <u>without giving an appropriate signal</u> in the manner herein after provided." N.Y. Vehicle and Traffic Law § 1163(a) (McKinney's 1959). (Emphasis added.)  That sentence explicitly incorporates § 1163(d) which prohibits drivers from changing lanes without first signaling the change.  <u>See</u> N.Y. Vehicle and Traffic Law § 1163(d) (McKinney's 1959).  As such, I find that plaintiff's failure to signal his lane change constitutes probable cause for the August 30, 2001 traffic stop by Officer Mitchell.[2] <u>See</u> <u>United States v. Scopo</u>, 19 F.3d 777, 781 (2d Cir.1994) (Probable cause to stop defendant where he failed to signal a lane change.).

While plaintiff alleges that he was the victim of racial profiling because his vehicle was targeted by MRNU simply because he is black, the only tangible proof presented by plaintiff of racial profiling is his skin color.  No reasonable inference can be made from that fact alone that the sole reason for the traffic stop was the color of his skin.  Plaintiff also failed to prove that the City maintains a policy of racial profiling as part of the MRNU drug interdiction program.  However, the City did prove by a preponderance of the evidence that there was a reasonable basis to

---

[2] It is irrelevant that the traffic ticket in question was later dismissed because Officer Mitchell testified that he did not appear to support the ticket because he was never informed of the hearing date.

consider plaintiff's automobile to be a "vehicle of interest," given that it was traveling from New York City, and was registered to an automobile dealership - two possible signs of drug trafficking which was supported by the testimony of two experienced police officers - Mitchell and Torres.

### B. Officer Mitchell Had Probable Cause to Search Plaintiff's Automobile

Plaintiff next contends that the search of his vehicle violated his Fourth Amendment rights because the officers had neither consent nor probable cause to conduct the search. Based on the facts adduced at trial, I find that the search of plaintiff's vehicle was both reasonable and valid since plaintiff consented to the search. I also find that plaintiff's consent was not necessary to conduct the search since the alert by the police dog alone provided sufficient probable cause to conduct the search.

Although plaintiff alleges that he never consented to the search of his vehicle, the evidence proves otherwise. Both Officer Mitchell and Officer Torres heard plaintiff acquiesce to the search on the condition that he could watch. He also admitted that he never asked the officers to stop searching once they started.

Moreover, to the extent that plaintiff alleges that he only consented because he was frightened by the officers, there is no proof in support of that claim. Plaintiff testified that Officer Mitchell "yanked" the door of plaintiff's vehicle open, thus giving plaintiff no choice but to consent to the search of his vehicle.

Also, plaintiff claims that he was intimidated into acquiescing to the search because he was surrounded by several armed police officers. In contrast, Officer Mitchell testified that he did not see any other officers in the area when plaintiff consented; Officer Torres testified that he was merely approaching plaintiff as he consented; and Officer Waterman testified that he did not arrive until after plaintiff had consented.

I find that there was sufficient probable cause for the search independent of plaintiff's consent. Under the automobile exception, a "warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband." United States v. Harwood, 998 F.2d 91, 96 (2d Cir.1993). "Probable cause exists where the facts and circumstances within . . . [the officer's] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir.2004) (quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)) (internal quotation mark omitted). Further, an officer's experience and training may allow him to form probable cause where a layman might not. Id. at 457.

Before the interior of plaintiff's vehicle was searched, Officer Mitchell knew that: (1) the police dog had indicated that he detected the scent of contraband, specifically a narcotic;

(2) plaintiff made a direct trip from New York City to Rochester Exit 45 prior to the stop; (3) plaintiff was driving a vehicle that was not registered to him; and (4) there appeared to be little luggage for what plaintiff told Officer Mitchell was a trip to New York City of several days duration for two people.

The fact that the K-9 dog Griz indicated that he detected the scent of narcotics by itself is sufficient probable cause to search plaintiff's vehicle. In Illinois v. Caballes, the Supreme Court held that a canine search of a vehicle during a lawful traffic stop "does not implicate legitimate privacy interests." United States v. Caballes, 125 S. Ct. 834, 838 (2005). Moreover, an alert by a police dog in the course of a traffic stop is sufficiently reliable to establish probable cause for a full search of the vehicle. United States v. Waltzer, 685 F.2d 370, 370 (2d Cir.1982). United States v. Fronk, 173 F.R.D. 59, 73 (W.D.N.Y. 1997). As such, I find that there existed probable cause to search the entirety of plaintiff's vehicle.

## CONCLUSION

For the reasons set forth above, I find that plaintiff has failed to carry his burden of proving by a preponderance of the evidence that his constitutional rights were violated in the course of the August 30, 2001 traffic stop and subsequent search. Failure to signal prior to changing lanes is a moving violation of the New York State Vehicle and Traffic Law and provides probable cause for police to conduct a traffic stop. Furthermore, the evidence

demonstrates that plaintiff gave Officer Mitchell permission to search his vehicle - conditioned on the fact that he observe the search as it was conducted. The proof clearly establishes that the plaintiff and his passenger (who did not testify) were present during the search.

In addition, since plaintiff's constitutional rights were not violated in the course of the August 30, 2001 traffic stop and search, there is no need to determine whether Officer Mitchell is entitled to qualified immunity under § 1983. See 42 U.S.C. § 1983; Warren v. Dwyer, 906 F.2d 70, 74 (2d Cir.1990). Accordingly, I grant judgment in favor of defendants City of Rochester and Officer Mitchell, and the Clerk of the Court is hereby directed to enter judgment in favor of defendants Officer John Mitchell and the City of Rochester, dismissing plaintiff's claims in all respects.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
Michael A. Telesca
United States District Judge

DATED: Rochester, New York
      August 8, 2005